## VAHLBERG v. STATE.

No. A-11628.   Oct. 22, 1952.

Rehearing Denied Nov. 12, 1952.

(249 P. 2d 736.)

104

John B. Ogden, Oklahoma City, for plaintiff in error.

John H. Cantrell and LeRoy A. Powers, Oklahoma City, amici curiae.

Mac Q. Williamson, Atty. Gen., Owen J. Watts, Asst. Atty. Gen., Granville Scanland, County Atty., and Jack E. Wilson, Asst. County Atty., Oklahoma City, for defendant in error.

JONES, J. The defendant, W. F. Vahlberg, was originally charged with two other individuals in an indictment returned and filed by a grand jury of Oklahoma county, charging them with the crime of forgery in the second degree. Subsequently, the district court after a hearing sustained a motion to quash the indictment and the defendant and the other individuals were discharged. Thereafter the county attorney commenced a prosecution against the same three individuals by filing a complaint before a committing magistrate in Oklahoma county. After a lengthy preliminary examination, one of the accused was discharged but the defendant and the other accused individual were ordered held to await trial in the district court. Thereafter the district court of Oklahoma county overruled a motion to quash the information so far as the defendant Vahlberg was concerned, but sustained the motion as to the other individual and he was discharged. The county attorney then filed an amended information charging the defendant Vahlberg alone with the crime of forgery in the second degree by allegedly violating the provisions of Tit. 21 O.S.1951 § 1586; a trial was had, the jury returned a verdict of guilty but left the punishment to be fixed by the trial court. Thereafter the defendant was sentenced to serve five years imprisonment in the State Penitentiary and he was appealed.

The printed record consists of 2700 pages. The following assignments of error are presented: 1. The evidence was wholly insufficient to sustain the verdict. 2. The preliminary information does not allege a crime. 3. The preliminary information was not verified within the meaning of the law. 4. The justice of the peace was without jurisdiction for the reason that an order had not been made by the district court directing or authorizing further prosecution after the indictment had been dismissed. 5. The information wholly fails to charge a crime. 6. The court erred in its instructions. 7. There was a fatal variance between the allegations of the preliminary complaint and the information.

W. T. (Bill) Hale testified he had been county treasurer of Oklahoma county since July 5, 1949; the record of all tax sales by the county treasurer are executed in triplicate and are records required to be kept by law. He produced the work sheets in connection with the November, 1946, tax sale which showed the Northeast Quarter (NE ¼) of Section Thirty-one (31), Township Thirteen (13) North, Range Three (3) West, was sold to one "Ted Smith." The permanent sales book for this sale also showed the tract sold to "Ted Smith" and that tax certificate, Number 5186 was issued to "Ted Smith." The county treasurer's books disclosed that on January 2, 1947, Ted Smith paid treasurer's fees totaling $49.75 on 199 tax certificates issued to him. The county treasurer makes a charge of 25 cents for the issuance of a tax certificate and the $49.75 paid by Ted Smith on January 2, 1947, was the treasurer's fee for the issuance of tax certificates to him. The November, 1946, delinquent tax sale was for unpaid 1945 real estate taxes and according to the tax rolls the Northeast Quarter (NE¼) of section Thirty-one (31), Thirteen (13) Three (3) was owned by Ida F. Hasley.

Ida Hasley testified that she and G. A. Nichols were joint owners of the Northeast Quarter (NE¼) of Section Thirty-one (31), Township Thirteen (13)

North, Range Three (3) West. She had difficulty getting her co-owner to help her pay the taxes, so she had not paid the 1945 taxes and they were included in the delinquent tax sale held on November 4, 1946. She attended this sale which was presided over by the defendant Vahlberg in his office. When the defendant called the Northeast Quarter (NE¼) of Section Thirty-one (31), Thirteen (13), Three (3), she attempted to place a bid in the name of J. A. Burt, Jr., who held a mortgage on the property. The witness testified, "Vahlberg then said, 'Well that is paid.' Vahlberg looked at Mr. Reynolds and Mr. Reynolds nodded in the affirmative and said. 'That is paid.' " She left the treasurer's office thinking her co-owner Nichols had paid the taxes. She was later informed by J. A. Burt, Jr., that a tax certificate had been issued to one "Ted Smith." She went to the county treasurer's office on March 14, 1947, and talked to defendant Vahlberg. The following conversation occurred at that time:

"Mrs. Hasley: Mr. Vahlberg, is it a positive fact that there is an outstanding tax certificate in the name of Ted Smith, and you have told me all along that those taxes were paid. And I said, 'Now, unless you cancel that certificate and issue one to me, as I bid on it, there is nothing else for me to do but to go to the County Attorney's Office,' and he said, 'You are trying to steal everything.' I said, 'You are a liar, Mr. Vahlberg.' And he got nervous and twisted his hands and he said, 'If you were not a woman I would throw you out of here on your fanny.' "

She went to the man who was county attorney at that time and made a report but nothing was done. She then gave her personal check to J. A. Burt, Jr., for $155.84 and he obtained a cashier's check and later procured an assignment of the tax certificate covering her property. There was no one at the tax sale by the name of Ted Smith which bid in her property, and the record in the county treasurer's office showing such sale was false. Later she sold her interest in the property to the American First Trust Company for $80,000.

A. C. (Jack) Reynolds was chief deputy county treasurer from July, 1945, to February, 1948; tabulated the November, 1946, tax sale. On Saturday before the sale on Monday he had a conversation with Vahlberg in the treasurer's office after the office was closed. Vahlberg said, "Ted Smith wants to reserve some property"; and gave him a list of property designated to be reserved, on which the defendant Vahlberg had placed a check mark "pd" or "ck" after the description of the property which Vahlberg said reserve for Ted Smith. Vahlberg had placed a check mark opposite the Northeast Quarter (NE¼) of Section Thirty-one (31), Township Thirteen (13) North, Range Three (3) West, the Ida Hasley property. Vahlberg informed him that "when I came to any of this property which he had checked when he was calling the sale" for the witness to say, "That is paid." The witness wrote the name of Ted Smith on the permanent sales record of the county treasurer's office and on the work sheet of the delinquent tax sale at the direction of Vahlberg. The Hasley property was not sold to anyone at the November, 1946 tax sale.

William C. Sherer, present cashier in county treasurer's office, and has been in treasurer's office since 1933. State's exhibit No. 10 was work sheet or tape out of cashier's register, showing cash receipts of January 2, 1947. Item No. 25743 shows receipt of $152.43 to pay 1945 taxes in 1946 sale. (This covered the Hasley-Nichols property.) Item No. 24744 shows payment of $3,418.50 plus treasurer's fees in the sum of $49.75 for 199 tax certificates, which showed a total payment of $3,468.25 paid by Ted Smith.

Glenn C. Skinner, public accountant, notary public. On March 14, 1947, he notarized an assignment of tax certificate No. 5186 purportedly signed by Ted Smith. No person named Ted Smith appeared before him and he had no independent recollection as to who brought the certificate to him for acknowledgment.

Theron Elder, vice president, First National Bank and Trust Company. W. F. Vahlberg had an account at his bank on January 2, 1947. A recordak picture of defendant's bank statement for the month of January, 1947, was identified and admitted in evidence. On January 3, 1947, there was a withdrawal by check of the sum of $3,468.25 from defendant's bank account. The county treasurer also kept an account at his bank. The county treasurer's deposits on January 3, 1947, totaled $37,369.88, and included the check on the defendant Vahlberg in the amount of $3,468.25.

J. A. Burt, Jr., had a mortgage on the Ida Hasley one-half interest in the Northeast Quarter (NE¼) Thirty-one (31), Thirteen (13), Three (3), which was in effect in November, 1946. On February 4, 1947 he checked the records in the county treasurer's office to see whether the taxes had been paid on this property and found a tax certificate had been issued to a Ted Smith; talked to county treasurer Vahlberg and told him that he wanted the certificate assigned to him and Vahlberg replied that he would see about it for him. He notified Ida Hasley and she gave him her check for a sufficient amount to pay for the assignment of the tax certificate. Later Vahlberg called him at the witness' office and told him the tax certificate had been assigned and was ready at his office. He went to Vahlberg's office and Vahlberg handed him the certificate which showed the assignment executed by Ted Smith on the certificate. He never saw and does not know a Ted Smith.

All of the various exhibits which had been identified and which chiefly constituted records of the county treasurer's office, tracing in detail the transactions in connection with the November, 1946, sale were admitted in evidence. Whereupon the state rested its case.

W. F. Vahlberg testified that he was county treasurer of Oklahoma county from July, 1933 to July, 1949, and that he was now 84 years of age. Jack Reynolds was his chief deputy but he had discharged him in March, 1948, because of general inefficiency. He never told Reynolds to mark off any properties and hold them out of the November, 1946, tax sale. Vahlberg conducted the November, 1946, sale from a newspaper advertisement of the sale and Reynolds kept an account of the sale. He remembered Ida Hasley attended the sale. When her property was called for sale she said, "I want the certificate for Burt," and Vahlberg told her that she couldn't do that as it was her own property and for her to go pay her taxes. His name is not Ted Smith, and he never used the name, does not know Ted Smith and never purchased any tax certificate in the name of Ted Smith. At the time of the November, 1946, sale he was becoming quite advanced in age and he relied solely upon his deputies for the proper handling of the tax sale. The work in connection with the sales was handled by his deputies and he never saw the certificate which was issued to Ted Smith. On December 31, 1946, he did write a check in the sum of $3,468.25, which check was the one deposited to the account of the county treasurer on January 3, 1947. He put this up as a loan to the county to cover the cost of certain certificates which had been sold and for which payment had not been made, with the thought in his mind that some settlement might later be made and he would get his money back; did not know in whose name the certificates were issued. All of the property owners later redeemed their property and he did not receive a tax deed on any of the tracts. Maude Cowle delivered the tax certificate to J. A. Burt, Jr., conveying the Hasley property, and he had nothing to do with it.

Maude Cowle was called by the state as a rebuttal witness, and testified that she was a clerk in the county treasurer's office. She never delivered the tax certificate involving the Hasley property, which was purportedly signed by one Ted Smith, to J. A. Burt, Jr.

This prosecution was instituted under the provisions of Title 21, O. S. 1951 § 1586, which provides:

"Every person who, with intent to defraud, makes any false entry or falsely alters any entry made in any book of accounts kept in the office of the Auditor of this State, or in the office of the Treasurer of this State, or of any county treasurer, by which any demand or obligation, claim, right or interest either against or in favor of the people of this State, or any county or town, or any individual, is or purports to be discharged, diminished, increased, created, or in any manner affected, is guilty of forgery in the second degree."

In order to sustain the conviction it was incumbent upon the state to prove the following:

(1) A false entry in any book of account of the county treasurer; (2) by which false entry any interest of the county or any individual; (3) is in any manner affected; (4) with intent to defraud.

If the testimony of the witness Reynolds was believed by the jury it was shown that at the direction of the defendant he falsely entered the name of Ted Smith on the work sheet of the county treasurer's office in connection with the November, 1946, tax sale and on the permanent sales record. These were books of accounts and records permanently kept in the office of the county treasurer and falsely showed that one Ted Smith had placed a bid and secured a tax certificate on the "NE-31-13-3". This false entry affected the right and interest of both the county of Oklahoma and the individuals, Ida F. Hasley and G. A. Nichols. The interest of these parties was affected in this way: If no bid had been placed on the property then the property would have been sold to the county. At the end of two years the property would have been advertised for sale at a resale and if no purchaser had appeared the county would have become the owner of the property. Tit. 68, O. S. 1951 § 432d. The interest of Hasley and Nichols was affected by the false entry because it erroneously caused a tax certificate to be issued against their property which might result in the later issuance of a tax deed to the holder of the tax certificate in case of neglect of the owners to redeem the property by the payment of taxes. At any event, under the record, the false entry caused the owners to have to pay an additional accumulation of interest and fees which they would not have had to have paid if the false entry had not been made and a false report that the taxes were paid given to the witness Hasley at the time of the sale. The county was actually defrauded of the sum of $3.41, which represented the additional penalty paid by Mrs. Hasley above what she could have redeemed the property at the time of the sale. There was no purchaser at the sale and the property should have been bid off in the name of the county. 68 O. S. 1951 § 391.

The intent to defraud must be determined by a consideration of all the evidence connected with the transaction. The undercover manner in which the county treasurer advised his chief deputy to make the false entry and to advise the public in case of an attempted bid on the property that "that is paid", together with the apparent use by the defendant of a wholly anonymous name to conceal his transactions from the public gaze, are all strong circumstances to be considered by the jury in connection with all the other facts and circumstances of the case as bearing on the intent to defraud. The fact that no one actually lost their property is not the test because the actions of the defendant indicated the apparent intent upon his part under cloak of the authority given to him as county treasurer to secure the tax certificates in a secretive and fraudulent manner. In Snider v. State, 71 Okla. Cr. 98, 108 P. 2d 552, 553, it is held:

"Proof of general intent to defraud is sufficient for conviction, even though no actual person is defrauded. The intent is always a question for the jury, and may be inferred by them from what the accused does and says and from all the facts and circumstances involved in the transaction."

The trial court did not err in submitting the case to the jury for its determination of the issues, and in overruling the demurrer of the defendant to the evidence of the state.

The second, fifth and seventh assignments of error may be consolidated for the purpose of discussion. These assignments of error presented these propositions: The preliminary complaint does not allege a crime; the information filed in the district court fails to charge a crime; there was a fatal variance between the allegations of the preliminary complaint and the information.

The preliminary complaint in substance charged that on November 4, 1946 Vahlberg and two other individuals were associated together in buying and selling tax certificates and tax titles and were operating under the assumed name of Ted Smith; that Vahlberg was the county treasurer of Oklahoma county; that Hasley and Nichols were the co-owners of certain property on which there were due 1945 taxes in the sum of $155.74; that at the November, 1946, tax sale Hasley appeared to bid on said property but when the property was cried for sale she attempted to bid in the sale in the name of J. A. Burt, Jr., for the amount of taxes due and that Vahlberg, who was conducting the sale, told her that the taxes had already been paid on the property, when in truth and in fact the taxes had not been paid; and that the name of Ted Smith was endorsed on the 1946 permanent sales record of the county treasurer showing that Ted Smith had purchased the tax certificate on the above-described property; that thereafter Ted Smith assigned said certificate to J. A. Burt, Jr.; that J. A. Burt, Jr., surrendered said certificate; that the record reciting Ted Smith purchased said property at public sale was a false entry made with intent to cheat and defraud Ida Hasley, all of which constituted forgery under provisions of Title 21 O.S. 1951 § 1586 contrary to the form of the statutes etc.

Some of the language in the preliminary complaint is surplusage and does not add to the legal sufficiency of the complaint. However, there are sufficient statements to allege the making of a false entry on a book of account of the Oklahoma county treasurer by the named defendants, and the further allegation of the violation of a specific statute.

This court often repeats that technical rules of pleading are not looked upon with favor by our court and particularly does this apply to preliminary complaints.

In the case of Mason v. State, 23 Okla. Cr. 111, 212 P. 1028, this court held:

"Technical rules of pleading need not be adhered to in the preliminary complaint to the same extent as may be required in the information in the trial court."

It should be borne in mind that the amended information upon which the defendant Vahlberg was tried was filed after one of his alleged coconspirators was discharged in the justice of the peace court, and the other named in the original information filed in the district court was discharged by the trial court after a hearing on a motion to quash the information. That left only the defendant W. F. Vahlberg to be tried. The county attorney then filed the amended information in which the names of the coconspirators were eliminated. The amended information in substance alleged that the defendant W. F. Vahlberg committed the crime of forgery in the second degree by violating the provisions of 21 O.S. 1951 § 1586, in that while he was holding office as county treasurer of Oklahoma county he did cause, procure and direct a false entry to be made in a certain book of account, to-wit: The November, 1946, tax sale record in that the name Ted Smith was listed as the purchaser at a tax sale had on said date of certain described porperty owned by Ida Hasley and G. A. Nichols; that the entry by said defendant of the name Ted Smith was false and fictitious, the said property

not having been sold to Ted Smith at said sale as therein represented, all of which the defendant well knew, and said entry was one which affected or purported to affect the interests of Hasley, Nichols, and Oklahoma county in said property and was made with the intent to cheat and defraud the said owners of their property etc.

Analyzing this amended information it states the following:

1. Defendant was county treasurer.

2. As such treasurer he caused to be made a false entry in a book of account of the treasurer.

3. Said false entry affected the interests of Oklahoma county, Hasley and Nichols.

4. The false entry was made with intent to cheat and defraud. The information. thus sufficiently complies with the law in that it charges the offense alleged to have been committed in the language of the statute and with such certainty that a person of ordinary understanding was bound to know the nature of the offense which he was alleged to have committed and was thus enabled to prepare his defense to said charge. Handley v. State, 69 Okla. Cr. 321, 102 P. 2d 947; Marks v. State, 69 Okla. Cr. 330, 102 P. 2d 955.

It is true that the amended information contained language not set forth in the original information that was filed nor in the preliminary complaint. However, the law permits amendments in either form or substance to be made. 22 O.S. 1951 § 304. In determining whether there was a variance between the allegations of the preliminary complaint and the amended information upon which the accused was tried it should be borne in mind that the state introduced a large amount of evidence at the preliminary examination. In the transcript filed in the district court, duly certified by the justice of the peace, appears this order:

"Court finds evidence insufficient to bind defendant W. C. Bonney, over to district court. Defendant Bonney released. Court finds evidence sufficient to bind W. F. Vahlberg and DeWayne Hayes over to district court. Bonds $1000.00 each. Defendants to remain free on bonds made in Justice of the Peace Court until arraignment in district court. Signed—Willis R. Stark."

In the case of Potts v. State, 72 Okla. Cr. 91, 113 P. 2d 839, 841, the rule of law followed by this court in determining whether there was a variance between the information and the preliminary complaint was set forth as follows:

"where one is charged in a justice of the peace court by preliminary complaint and an examining trial has been had and the defendant held to the district court, the county attorney is authorized to file an information in the district court upon any reasonable charge which the facts at the preliminary examination justify, and that if a preliminary is waived, * * * he may file an information in substantial compliance with the complaint filed before the justice of the peace." Rickman v. State, 70 Okla. Cr. 355, 106 P. 2d 280; Little v. State, 21 Okla. Cr. 1, 204 P. 305; Wade v. State, 18 Okla. Cr. 592, 197 P. 180.

In Sweden v. State, 83 Okla. Cr. 1, 172 P. 2d 432, this court held that a variance between allegations of a preliminary complaint and information is not material unless it misleads accused in preparing his defense or exposes him to double jeopardy.

In Agent v. State, 18 Okla. Cr. 281, 194 P. 233, this court held:

"this court will presume, in the absence of an affirmative showing to the contrary, that the information upon which the case is tried was supported by the facts disclosed by the evidence of the state at the preliminary hearing."

In this connection we note that the transcript of the evidence taken before the committing magistrate, which was included in the record filed with this court on appeal, not only failed to show that the facts disclosed by the evidence at the preliminary examination would not support the information but they affirmatively disclose abundant facts to support the information which was filed. Furthermore, in Lewis v. State, 39 Okla. Cr. 119, 263 P. 473, this court held that in filing an information in the district court after a preliminary examination had been given the accused, the county attorney may not substitute one offense for another, but the information may vary in charging circumstances, methods, or means, or informal and nonessential matters of the crime.

We now come to the proposition that the preliminary complaint was not verified within the meaning of the law and was therefore insufficient to confer jurisdiction upon the justice of the peace court. This proposition is presented under two divisions: 1. The verification was made before Mildred S. Boyer, Clerk for the Justice of the Peace, and she had no authority to administer the oath. 2. Sam Oliver who attempted to verify the complaint had no personal knowledge of the facts and the complaint was therefore a nullity.

In Caffee v. State, 11 Okla. Cr. 263, 145 P. 499, the information was verified before a clerk of the court. Counsel for the accused filed a motion to quash the information on the ground that informations in misdemeanor cases must be sworn to before a magistrate. This court sustained the legality of the verification and held that under the statutes clerks of the district, superior and county courts were authorized to administer oaths and that *the administration of an oath by an officer is a ministerial, and not a judicial act.*

The Constitution of Oklahoma, Article 2, Sec. 17, provides for the prosecution of persons by indictment or by information and further provides that no person shall be prosecuted for a felony by information without having had or waived a preliminary examination. However, the procedure in connection with the preliminary examination is controlled by statute where the same does not conflict with this constitutional provision.

22 O.S. 1951 § 171 provides:

"When a complaint, verified by oath or affirmation, is laid before a magistrate, of the commission of a public offense, he must, if satisfied therefrom that the offense complained of has been committed, and that there is reasonable ground to believe that the defendant has committed it, issue a warrant of arrest."

Counsel for the accused cite and rely upon the cases of Ex parte Owen, 10 Okla. Cr. 285, 136 P. 197, and Bowes v. State, 7 Okla. Cr. 316, 317, 126 P. 580, to sustain their position. Ex parte Owen, supra, is clearly not in point as it was a habeas corpus case involving the extradition of the petitioner and the affidavit in support of the complaint was sworn to upon information and belief and was not in positive terms. In Bowes v. State, supra, this court held that in 1911, at the time the prosecution was instituted against Bowes, there was no statutory procedure pertaining to the verification of an information charging a misdemeanor and that therefore it was governed by the common law and at common law such oath was taken before a magistrate. Subsequent to the rendition of both the Bowes and Owen opinions, in 1915, an act was passed by the Oklahoma Legislature creating the office of clerk of the justice of the peace in cities of the first class, and granting them power to administer oaths to the same extent as the justices could administer oaths. These statutes provide:

"There is hereby created the office of the clerk of the Court of Justice of the Peace in all cities of the first class of this State, and each justice of the peace in such cities of the first class have the right to appoint a clerk for his said

court and the appointee of such justice shall hold such position during the pleasure of the Justice, but such clerk shall receive no compensation from the State or the county, but shall receive such compensation as shall be agreed upon between the appointee and the justice to be paid by the justice out of fees earned by him." 39 O.S. 1951 § 21.

"Said clerk shall have the power to administer oaths and shall have power to issue processes of all kinds and approve bonds in the same manner and to the same extent as the justice himself has now, or shall hereinafter have." 39 O.S. 1951 § 22.

"All actions and proceedings over which a justice of the peace has jurisdiction may be filed with said clerk with the same effect as if filed with the justice himself." 39 O.S. 1951 § 23.

"The appointment of said clerk by the justice of the peace shall be in writing, signed by him and shall be filed with the County Clerk, and said clerk shall take and subscribe to the same oath of office as all other public officials are required to take and subscribe to, and said oath of office shall be filed in the office of the County Clerk, and said clerk shall execute a bond in the sum of five hundred dollars ($500.00) with one or more sufficient sureties, to be approved by the Board of County Commissioners, and which bond shall be for the faithful performance and discharge of duties of clerk and any one that may be injured by any of the official acts and conduct of said clerk may bring an action on said bond in his or her own name." 39 O.S. 1951 § 24.

These acts of the Legislature have been brought forward and re-adopted as a part of the code of laws of Oklahoma today. 39 O.S. 1951 §§ 21 to 24, inclusive, supra. There is nothing so far as we can ascertain in these provisions of law which conflict with any section of our Constitution.

Under the second section of this proposition presented by the accused it is contended that Sam C. Oliver, who verified the preliminary complaint, had no personal knowledge of the facts stated in the complaint but only verified the same because he was told to do so by the county attorney. At the time the motion to quash the preliminary complaint was presented and later before the district court counsel for the defendant offered to show that Sam Oliver was an evidence man in the office of the county attorney and had no personal knowledge of the facts stated in the complaint, but on each occasion an objection to the offer of proof was sustained and the motion to quash was overruled. The brief of amici curiae is devoted exclusively to this proposition. Although much argument is devoted in the brief of defendant to the proposition that the failure of the court to hear evidence on their motion to quash was a denial of federal and state constitutional rights, this court is unable to agree with their contention. The position of counsel for defendant can best be summarized by a quotation from their brief in which they state:

"If a County Attorney can direct one of his lay employees, such as a stenographer, a secretary, a detective, a police officer, or an evidence man, to go sign affidavits such as this to bring about the arrest of a citizen upon a felony charge such as this, when he knew, and the employee knew that the affidavit was to be completely false in stating facts upon positive knowledge, no citizen's life or liberty or happiness would be secure for one instant. It matters not, in this regard, that at some future stage of the proceeding the accused person shall have an opportunity for exoneration. He is entitled to be protected in the meantime (1) from the false charge, (2) from the illegal arrest and deprivation of liberty, (3) from the hazards of requirement of bail, (4) from the expense and vexation of defending himself against the illegal charge and arrest, and (5) from a possible miscarriage of justice in the end."

This is not the first case in which the question thus raised has been presented before this court. In discussing this proposition it should be borne in mind that

the verification here involved is in positive terms and is not on information and belief. In the early case of Moss v. State, 4 Okla. Cr. 247, 111 P. 950, 952, the information was verified in positive form by the affidavit of the enforcement officer in the office of the county attorney. A motion to quash the information was filed on the ground that the person who verified the information had no personal knowledge of the facts charged, which raised the identical question here presented. Judge D. A. Richardson, one of the most able men who ever sat on this court, wrote a lengthy opinion discussing this proposition wherein he stated:

"We think there was no error in the court's ruling. An information which is not verified at all, or which on its face shows that it is verified only on information and belief, should be quashed or set aside on a timely motion for that purpose, for the reason that such verification constitutes no sufficient showing of probable cause. But, where the *information is verified in positive terms as true, it constitutes a showing of probable cause, even though it may subsequently develop that the affiant had no personal knowledge of the facts alleged. Such verification makes a prima facie showing, which is all that is required; and on a motion to quash no issue can be made as to the knowledge or want of knowledge of the person who verified the information.* The verification supports the information as the testimony taken before the grand jury supports an indictment. The want of a verification or a verification insufficient on its face will justify the quashing of the information on a seasonable motion, just as a showing that an indictment was found and returned upon no testimony or upon wholly insufficient testimony before the grand jury will justify setting the indictment aside. But, just as an indictment cannot be set aside on a showing that the testimony upon which it was found, though competent and apparently sufficient, was in fact false and perjured, so an information properly verified on its face cannot be set aside on a showing that the affiant had no personal knowledge of the matters to which he swore in verifying it. *The sufficiency of the verification must be determined from what is stated therein, and not from evidence aliunde.*" (Italics ours.)

Judge Richardson then stated that after a diligent search he had been unable to find any authorities to sustain the position of the defendant and proceeded to cite many adjudicated cases from other jurisdictions sustaining his conclusion. He then further stated in his opinion:

"The foregoing are all the cases we have been able to find on the question, and, as will be seen, they are all of one accord. When we consider the great variety of criminal cases, the widely different forms in which they arise, and in many instances the various and disconnected sources from which fragmentary pieces of evidence must be obtained, conclusive when considered together, but no portion of which is sufficient alone, and the further fact that the circumstances are often such that no one witness in the case can truthfully say that he has personal knowledge that all the facts necessary to be charged in the information are true, it may well be doubted whether the law contemplates that the verification of an information must be made by one having personal knowledge of all the essential facts charged. In any event, we are in accord with the cases cited above, and we hold that, where the verification of an information is in due form, no issue can be made as to the knowledge or want of knowledge of the person who verified it for the purpose of quashing or setting aside the information, either before the trial or during its progress."

The court has adhered to the above decision in many cases. Munn v. State, 5 Okla. Cr. 245, 14 P. 272; Oelke v. State, 10 Okla. Cr. 49, 133 P. 1140; Boswell v. State, 19 Okla. Cr. 443, 200 P. 256; Logan v. State, 42 Okla. Cr. 1, 274 P. 39; Haggard v. State, 51 Okla. Cr. 233, 1 P. 2d 180. The rule of law adhered to in all of the above cases is succinctly set forth in Boswell v. State, supra, as follows:

"Where an information in legal form is verified as true in positive terms, such verification constitutes a sufficient showing of probable cause to authorize the issuance of a warrant of arrest and to put the defendant on trial, and on a

demurrer to the information and motion to quash the warrant no issue can be made as to the knowledge or want of knowledge of the facts charged on the part of the person who verified the information; nor can the information be set aside on the ground that the person who verified it had no personal knowledge of the facts verified."

Counsel for the defendant asks us to reconsider and overrule the decisions above cited and many others to which this court has consistently adhered. In view of the earnestness with which this proposition was presented by counsel, we have closely read the above decisions and considered the arguments of counsel, and we are firmly of the conviction that the decision by Judge Richardson, in Moss v. State, which formed the foundation for all the subsequent decisions, was fundamentally sound and in accordance with constitutional principles. Accordingly, neither the committing magistrate nor the district judge erred in overruling the motions to quash based upon the attack made on the verification of the preliminary complaint.

It is further contended that the justice of the peace court was without jurisdiction to proceed with the instant case and that the prosecution was invalid for the reason that an order had not been made by the district court directing or authorizing further prosecution after the indictment charging the same offense had been dismissed.

The record discloses that after the originial indictment was returned against the accused and two other individuals that they filed their separate motions before the district court challenging the grand jury panel. After a hearing on said challenges the district court, on October 24, 1949, made the following order:

"I have carefully considered all the evidence in this case, and have come to the conclusion that the motions of the defendants challenging the Grand Jury Panel and to Quash the Panel must be sustained as a matter of Law.

"The principal contention of the defendants is that the Grand Jury was not drawn and empaneled as provided by law, pointing out the fact that fifty jurors were summoned rather than a maximum of twenty-four, as provided by statute, from which to select the Grand Jury, permitting the so-called 'hand-picking' of a jury.

"I am not unmindful of the more recent decisions of our appellate courts and particularly the Childers case, wherein the Supreme Court pointed out that the mere ordering of a larger number of Grand Jurors drawn, was not, per se, error warranting the quashing of an Indictment. Our appellate courts have long adhered to the rule that although this is an irregularity, it is not fatal, and that a substantial compliance with the law is all that is necessary.

"In this case, however, the defendants have brought to the attention of the Court numerous other facts, circumstances, and incidents occurring prior to the empaneling of the Grand Jury, during its sessions, and subsequent to its adjournment up to the day preceding this hearing, none of which, standing alone, would be sufficient to warrant the quashing of this Grand Jury; but considering all of these irregularities as a whole, I am convinced that there has not been a substantial compliance with the laws of this state, and from the Record in this case, it must be presumed, as a matter of law, that bias and prejudice existed resulting in the defendants being deprived of a substantial right.

"I am certain that everyone connected with the empaneling and subsequent operation of this Grand Jury acted in good faith, and attach no importance to the charge that Mr. Holloway was not authorized to appear before the Grand Jury as Assistant County Attorney. In view of the entire record, I am convinced that, as a matter of law, the defendants in these cases did not receive that fair and impartial consideration by a Grand Jury, to which they, as citizens, were entitled under the due process clauses of both the State and Federal Constitutions.

"This finding, of course, has no bearing on the guilt or innocence of any of the defendants, as that issue is not before the Court in this proceeding, and the *County Attorney may, in his discretion, either file Informations or request the empanelling of another Grand Jury to inquire into these same matters.* (Italics ours.)

"The motions of the separate defendants to quash the Grand Jury Panel are sustained in each case and all of its actions with reference to these cases are adjudged to be ineffective and invalid."

Counsel for the accused cite the statute relative to the sustaining of a demurrer to the information and the case of Ray v. Stevenson, 71 Okla. Cr. 339, 111 P. 2d 824. The statute relied upon reads:

"If the demurrer is sustained, the judgment is final upon the indictment or information demurred to, and is a bar to another prosecution for the same offense, unless the court, being of opinion that the objection on which the demurrer is sustained may be avoided in a new indictment or information, direct the case to be resubmitted to the same or another grand jury, or that a new information be filed." 22 O.S. 1951 § 508.

Ray v. Stevenson is not in point as it involved a factual situation entirely different from that now before the court and did not involve a motion to quash or a challenge to a jury panel.

We think the contention of counsel cannot be sustained for three reasons:

(1) If counsel were right in his contention we believe that the order of the district judge constituted an authorization for the county attorney in his discretion to file a new information. (See italics in above order.) Hollins v. State, 56 Okla. Cr. 275, 38 P. 2d 36.

(2) By statute it is provided as follows:

"An order to set aside an indictment or information as provided in this article is no bar to a further prosecution for the same offense." 22 O.S. 1951 § 501.

See State v. Stout, 90 Okla. Cr. 35, 210 P. 2d 199; Ray v. Stevenson, supra.

(3) This was not an attack upon the information but was simply a challenge to the jury panel.

It is next contended that the evidence was insufficient in that there was no corroboration of the testimony of A. C. Reynolds, who under the evidence was an accomplice of the defendant.

Reynolds testified that he entered the name "Ted Smith" on the permanent sales record of the treasurer's books of account at the direction of Vahlberg. We think under the evidence it is reasonable to conclude that Reynolds was an accomplice of Vahlberg in making the false entry and should have been corroborated. However, there is ample corroboration of the defendant's complicity in this crime. His statement to Mrs. Hasley at the time of the sale when she sought to place a bid for the property in the name of J. A. Burt, Jr., "that is sold isn't it Jack" (addressing himself to Reynolds); his procuring the assignment of the tax certificate purportedly signed by "Ted Smith" and delivering it to J. A. Burt, Jr.; his writing of his own personal check to pay for 199 pieces of property, all of which were shown by the treasurer's books to have been sold to "Ted Smith", were all corroborative facts and were independent evidence of the defendant's guilt sufficient along with the testimony of the alleged accomplice to sustain the conviction. The tax certificate was issued to "Ted Smith" and was in the possession of the defendant Vahlberg. The court properly instructed the jury concerning the neces-

sity of corroboration of the testimony of the accomplice and no exception was saved to any of the instructions given in that connection.

The defendant also, attacks certain of the instructions which were given by the court. Instruction No. 5, to which objection was made, reads:

"The law prescribes but one way by which property may be sold at tax sale, and that is by a public sale cried by the County Treasurer in his office, and upon public acceptance by him of the highest bid, publicly and openly made by a person attending the sale, bidding in his own behalf or as representative for some other person. The highest bidder for any particular parcel of land thus being entitled to have his name entered in the return of sale and the tax sale record as the 'purchaser' thereof, as a part of the official records showing that he purchased the property at public sale in the manner prescribed by law, and that as a result of such transaction is entitled to receive a tax certificate, which if not redeemed by the land owner within a period of two years may thereafter be used as the basis for procuring a tax deed.

"An entry made by or under the direction of the County Treasurer, of the name of any person either real or fictitious, purporting to be the 'purchaser' of a parcel of land, upon the official tax sale record, knowing that no public bid was actually made by or on behalf of such purported purchaser and accepted by the Treasurer as the highest bidder at pubic sale pursuant to law, would constitute a 'false entry in a book of account' kept in the office of the County Treasurer, affecting the interests of the owners of the property involved in such purported tax sale. Any person making or causing such a false entry to be made with intent to defraud, would be guilty of forgery in the second degree."

Counsel state that the first part of this instruction is erroneous for the reason that under the authority of Oklahoma City v. Vahlberg, 185 Okla. 28, 89 P. 2d 962, the Supreme Court of Oklahoma held that "in case no one bids on the property, the property is by operation of law sold to the county". Counsel is correct as to the manner in which property is sold to the county where there is no bid placed on the property. However, after carefully considering the above instruction, we think it is a fair statement of the law relative to the issues before the jury. The only way in which a tract of land can be sold to an individual at a tax sale is in the manner stated in the first part of this instruction. This instruction has to be considered in connection with instruction No. 4, to which no objection was made, and which reads:

"The laws of this State further provide that on the first Monday in November in each year the County Treasurer shall offer at public sale at his office all lands which shall be liable for taxes, and that such property shall be sold to the person who offers to pay the amount due on any parcel of land for the smallest portion of the same, since such person shall be considered the highest bidder.

"The law further requires that the County Treasurer make a return of tax sale showing the land sold, the name of the purchasers and the sum paid by them; and that a list of all lands or town lots sold, a description of the same, the amount of sale, the date of sale and the name of the person to whom sold, shall be transcribed from the return of sale to the tax sale record being the record identified in evidence in this case as Exhibit No. 7."

Instruction No. 6 constituted a fair explanation of the state's theory of the case and of the law pertaining thereto and we cannot find where the instruction is erroneous in any particular.

Defendant attacks that part of instruction No. 3 in which the court stated:

"In this connection, you are instructed that the record books referred to in this case as the 'Work Record' and the 'Permanent Tax Sales Record' admitted in evidence and identified as Exhibits No. 6 and No. 7 are 'books of account' kept in the office of the County Treasurer of Oklahoma County within the meaning of the foregoing provision of law."

for the reason that he contends it constituted a comment by the court on the weight of the evidence and was an invasion of the province of the jury for the reason that one of the issues in the case was whether the purported tax sales records identified by the county treasurer were books of account required to be kept by the treasurer; that this was an issue of fact for the determination of the jury and was not a question of law to be determined by the court.

At first glance this contention seems to have substantial merit, but a fuller consideration has convinced us that whether the documents identified by the county treasurer as the "return of sale" and "record of sales" being exhibits Nos. 6 and 7 were books of account were legal questions which should be decided by the court and not left for construction by laymen on the jury. The general rule is stated as follows:

"Generally, the interpretation or construction and the meaning and legal effect of written instruments are matters of law for the court." 53 American Jurisprudence, Sec. 250, Trial.

Where the interpretation to be given to a written instrument depends upon collateral and extrinsic circumstances it then becomes a question for the determination of the jury to be aided by proper instructions by the court.

Tit. 68 O.S. 1951 §§ 386 and 387 are the statutory provisions making it mandatory for the county treasurer to make a "Return of sale" in connection with his handling of the annual sale, and further makes a requirement that a permanent record of sales in which certain data is set forth must be kept by the treasurer. County Treasurer Hale, when he was a witness, testified as to the existence of these records in the treasurer's office in connection with the 1946 tax sale and without objection he testified that these were records required by law to be kept by the treasurer. Whether or not the work record described as exhibit 6, and permanent sales record indentified as exhibit 7 were books of account in accordance with the statute under which the prosecution was maintained was a question of law for the court to determine. No issue was made as to this question in the trial of the case. The defendant Vahlberg did not attempt to contend that these exhibits were not books of account required to be kept by the treasurer. His defense, as hereinabove pointed out, was denial that he made a false entry in the records or authorized it to be done, but he stated that the alleged false entry was made without his knowledge or consent by persons who imposed upon him because of his advanced age.

In the case of Hoovel v. State, 125 Tex. Cr. R. 545, 69 S.W. 2d 104, 108, the Court of Criminal Appeals of Texas held:

"it is within the province of the trial court to construe the legal effect and meaning of documents and other written instruments and a charge on such legal effect and meaning would not be a charge on the weight of the evidence."

In Richanbach v. Ruby, 127 Or. 612, 271 P. 600, 61 A.L.R. 1441, the Supreme Court of Oregon held that it was the duty of the court in its instructions to construe documents introduced in evidence and clear up all doubt in the minds of the jury as to the legal effect thereof.

We have carefully considered not only the instructions to which complaint was made, but all of the instructions, and it is our conclusion that they constitute a substantial statement of the law pertaining to the issues before the jury. Although exceptions were saved to certain of the instructions hereinabove discussed, there were no requested instructions presented on behalf of the defendant and counsel for the accused did not point out to the trial court wherein they thought the instructions to which exceptions were taken were erroneous.

This was a voluminous record and lengthy briefs have been filed on behalf of the accused in which each specification of error was argued. It is doubtful if there was ever a trial without some error being made. Sometimes the error is trivial, sometimes so glaring that an appellate court is forced to reverse the trial court's judgment. This case was hard fought with able lawyers valiantly pleading the cause of their client. The court being called upon to make instant decisions during the trial might have made a few mistakes. But the mistakes were very few and wholly immaterial and did not affect the outcome of the trial nor deny the defendant a fair trial. If this case were tried a dozen times, in all probability there would never be a trial with fewer mistakes than the instant case. The defendant has been given a fair trial in substantial compliance with the law and has no just cause for complaint. He was simply caught in a trap of his own planning and when the showdown inevitably came he had no reasonable explanation for his conduct.

This brings us to the final contention of the defendant in this case as to the alleged excessiveness of the punishment. This was not a case where the jury fixed the punishment. The verdict of guilty was returned but the punishment to be meted out to the defendant was left to the discretion of the trial court. The court in his discretion could have fixed the punishment by imprisonment in the penitentiary for any period not exceeding seven years. It could have been as low as one day. Counsel for the accused contend that even under the state's evidence the most that the defendant was guilty of was a misdemeanor, citing the statute which would prohibit the county treasurer from voluntarily becoming interested in a county tax sale either directly or indirectly. 21 O.S. 1951 § 344. The county attorney was vested with authority to make an election whether to prosecute the accused for a misdemeanor, which would carry a jail sentence, or the more serious felony charge. It is always difficult to determine what punishment is adequate in any particular case. The penalty should always be sufficient to punish the wrongdoer and serve to deter others from committing similar offenses. Hatred, revenge and mob pressure largely determine the punishment among barbarians, but they have no place in a civilized society. The chief difficulty in this case arises from the extreme old age of the defendant and his physical condition. He is 85 years of age and according to the record before us is in poor health. This factor alone impels us to the conclusion that to sustain the sentence of five years imprisonment in the penitentiary would be tantamount to a life sentence, and that the facts do not justify the imposition of so severe a punishment. In fact, the Legislature, as pointed out by counsel for the accused, in another statute, has stated that the acts committed by the accused would only amount to a misdemeanor and the most that could be meted out upon a conviction would be a jail sentence. But in this case we have no alternative except to commit the accused to the penitentiary for the reason that the statute only provides for a penitentiary sentence.

For the reason that we are holding that the prosecution could be maintained on the felony charge of forgery, it is our conclusion, after giving the fullest consideration to the many profound legal questions presented on behalf of the accused and to all the other facts and circumstances in the record, that justice would be fully served by reducing the sentence assessed against the accused to a term of 120 days imprisonment in the State Penitentiary.

It is therefore ordered that the judgment and sentence of the district court of Oklahoma county be modified from a term of five years' imprisonment in the penitentiary to a term of 120 days in the penitentiary, and the judgment and sentence as thus modified is affirmed.

BRETT, P. J., and POWELL, J., concur.